[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On March 16, 2000, the plaintiffs, Stewart Hutchings, Christel CT Page 4403 Manning, Bernadette Canning, John H. Issacs and Reed Smith, filed a verified complaint against the defendants, Connecticut Department of Economic and Community Development (DECD) and Connecticut Office of Policy and Management (OPM). The single-count complaint alleges that the DECD and OPM have violated the Connecticut Environmental Policy Act (CEPA), General Statutes §§ 22a-1a through 22a-1h, and the Connecticut Environmental Protection Act, General Statutes §§ 22a-14 through22a-20. The plaintiffs seek an order that would require the DECD to hold a public hearing and enjoin the OPM from acting upon a document, called the finding of no significant impact (FONSI), sent to them by the DECD as required by § 22a-1d[1], until a public comment period and public hearing can be held pursuant to § 22a-1d.
The facts underlying this action are as follows: The city of New Haven proposed building a mall to be known as the Long Wharf Galleria on a 55 acre site in the Long Wharf area which is located near the junction of Interstates 95 and 91 in New Haven County. The proposed mall would be super-regional in scope, consisting of more than one million square feet of retail and office space, with a projected total cost approaching $500 million, of which $60 million is expected to be funded by the state and $25 million by the city of New Haven. Pursuant to CEPA requirements, the city of New Haven sought approval of its plans from the DECD. The DECD evaluated the proposed mall construction in 1998 and early 1999 and prepared a document entitled Draft Finding of No Significant Impact (DFONSI), dated February 16, 1999 (Plaintiff's Exhibit 3); rather than an environmental impact evaluation (EIE), pursuant to CEPA.
The DFONSI contains a "finding" that no significant environmental impact will be made to the area surrounding the proposed mall site. The DECD, pursuant to § 22a-1d, released the DFONSI to the public for review with a public comment period ending May 7, 1999, and held a public hearing on April 22, 1999, to receive further comments on the document. The DECD thereafter undertook to commission studies to reply to the questions raised during the comment period and at the public hearing. In the CT Page 4404 meantime OPM, which was required by DECD regulation to act on the DFONSI, found the DFONSI inappropriate.
On March 9, 2000, the DECD prepared a second finding of no significant impact (FONSI). (Plaintiff's Exhibit 7.) The finding of the FONSI is identical to the finding in the earlier DFONSI, namely that there will be no significant environmental[2]
impact on the surrounding area, but contains numerous appendices of information which were not provided in the DFONSI. On March 13, 2000, the plaintiffs delivered a petition to the DECD containing twenty-five or more signatures requesting a hearing under § 22a-1d on this newly released FONSI but DECD refused to hold a hearing on the FONSI, on the ground that a hearing had already taken place. Therefore, on March 17, 2000, the plaintiffs sought and received a temporary injunction from the court,O'Neill, J., prohibiting the DECD and OPM from acting on the FONSI pending a show cause hearing to determine if a second comment period and public hearing were warranted.
On March 20, 2000, a five-day evidentiary hearing began before this court, pursuant to the show cause order issued by Judge O'Neill. Oral testimony was heard, written memoranda of law were submitted by all parties and concluding arguments were heard on April 5, 2000.
At the onset of the hearing, it was represented that OPM was scheduled to act on the FONSI on March 24, 2000. Since the temporary injunction issued by Judge O'Neill expired on March 20, 2000, the parties stipulated that the injunction would continue through March 24, 2000. On March 23, 2000, although this hearing had not concluded, this court was advised that OPM still intended to act on the FONSI on March 24, 2000, and would not agree to an extension of the injunction. Hence, this court issued a restraining order preventing any action by OPM until a ruling was made in this case. On March 29, 2000, this court granted the motions of the City of New Haven and Long Wharf Galleria, LLC, the proposed developer of the mall, to be made party-defendants.
The issue before the court is whether the FONSI submitted by CT Page 4405 the DECD to the Secretary of OPM differed significantly enough from the DFONSI so as to consider it, in effect, a new FONSI warranting its own public hearing under § 22a-1d. The defendants argue that the FONSI is not a new document since there has been no change to the size and scope of the project, but rather it is a document which responds, as statutorily required, to the questions and comments received by the DECD during the public comment period and at the public hearing previously held. The defendants maintain that they have therefore followed the procedures required by § 22a-1d and no further public hearing is required. Further, the plaintiffs argue that the inclusion of the enormous volumes of text and "technical memoranda" in the FONSI was meant to complete an incomplete document and not simply to address comments made by the public. The plaintiffs allege that the defendants' packaging of the FONSI as a "response document" is an attempt to avoid any further questions and comments on the data in the new studies and push the mall project through quickly, avoiding the time delays inherent in the CEPA process and any further public scrutiny.
 I
The DFONSI consists of three volumes of material: the actual finding of no significant impact and two appendices which consists of a "Traffic Impact and Access Study" appendix and a "Structures, Dredging and Fill Permit Application Package" appendix. The FONSI contains a volume identical to the "finding" volume in the DFONSI, but also includes volumes I, II, and III that describe participation and evaluation of the DFONSI, as well as massive appendices lettered A through I, consisting of several bound volumes and one large looseleaf binder. These appendices are briefly described as follows: Appendix A contains numerous memoranda regarding air quality analysis; Appendix B contains a storm water and dewatering application and information; Appendix C contains Connecticut DEP title wetland correspondence; Appendix D contains an Indirect Source Permit and correspondence from DEP concurring that an Indirect Source Permit is not required; Appendix E contains an EAP letter regarding "Smart Growth"; Appendix F, consists of two bound volumes and contains a state CT Page 4406 traffic commission application and approval certification, and various traffic impact and access studies and recommendations based on various plans dated from March 1999 through September 1999; Appendix G contains a remedial action plan; Appendix H contains a Clean Water Act section 404 permit and supplemental information, and a Structures, Dredging and Fill application to DEP; Appendix I contains a Water Diversion Permit; and Appendix J contains an economic impact technical memorandum. In addition to the sheer volume of material, the plaintiffs claim significant changes exist in the FONSI as compared to the DFONSI which can be substantiated in at least three areas.
 A.
Appendix A contains an air impact analysis of traffic emissions relative to the proposed mall. Although the DFONSI stated that the proposed mall was expected to generate between 22,000 and 29,000 new vehicle trips per day, the DFONSI does not contain any site-specific air quality studies for carbon monoxide or ozone. Rather, the DFONSI relies on the evaluation of carbon monoxide hot spots that was conducted for the I-95 New Haven Harbor Crossing Environmental Impact Statement. Dr. Brook Crossan, an experienced environmental engineer, testified that he had never seen an evaluation of a government-sponsored project that failed to contain ozone studies or site specific air quality evaluations. The FONSI, however, contains an air quality report of June 1999 which examines critical intersections near the mall, as well as providing an air quality modeling analysis.
 B.
Appendix J contains a large quantity of new information regarding the economic impact associated with the mall project. Specifically, eight different analyses were undertaken for the purpose of estimating the economic impact, physical impact and retail trends employing REMI analysis, IMPLAN analysis and Gravity Model analysis. The FONSI anticipates the economic impact to be positive. The DFONSI contains very little of the above information. There was expert testimony that the economic CT Page 4407 analysis contained in the DFONSI was inadequate because it was based on a simplistic method of using "look up" tables, instead of the type of complex economic modeling that is typically used to measure the economic impacts of projects of this nature. Moreover, the DFONSI did not consider the economic harm that the mall project would cause the city of New Haven, surrounding areas and other counties, particularly the effect this project would have on existing businesses.
 C.
The DFONSI states that the proposed mall will not result in any adverse impacts on public health and safety. The DFONSI addresses hazardous materials on pages twenty-nine and thirty, stating that the site will comply with Connecticut's Remediation Standard Regulations. Appendix G of the FONSI, a two and one-half inch thick binder, contains the Remedial Action Plan and contains hundreds of pages of new information discussing the identity, extent and location of toxins at the site of the proposed mail. For example, Appendix G states that "open excavations into, stockpiling of, and transport of coal tar contaminated soil and NAPL [another family of contaminants] could have implications relative to air quality and public health." Appendix G also states that "soil excavation at the site has numerous disadvantages, including . . . the potential on-Site and off-Site health and safety risks to remedial construction workers associated with soil and groundwater (from dewatering) handling and to the public due to VOC [volatile organic compound] emissions and dust. . . ."
 II
The vast amount of information in the preceding section was not contained in the DFONSI. There is little question that the above studies included in the FONSI discuss significant issues and provide a plethora of information that was not available in the DFONSI. Mr. McLellan, a planning analyst supervisor with OPM, testified that OPM found the DFONSI inappropriate because it did not contain enough information upon which to make a finding. CT Page 4408 Additionally, Mr. Camarata, an executive director with the DECD, also agreed during his testimony that if significant changes in the size and scope of a project or the passage of a significant amount of time such that the conditions on which the analysis was based were no longer accurate, this might cause the project to be viewed as a new one, warranting a second public hearing under BIB or a revised FONSI.
The studies and information contained in the FONSI are significant and fundamental in assessing the environmental impact, and, in effect, make the FONSI a new document and not a mere continuation of the DFONSI. This conclusion is buttressed by a letter dated March 20, 2000, from Karl J. Wagener, Executive Director of the Council on Environmental Quality (CEQ) to Jeffrey Smith of the OPM which states in part: "There is no question that the original FNSI [DFONSI] was deficient in many regards. In hindsight, it should not have been published and circulated for review until the detailed economic, traffic and air quality analyses were complete. Early in 1999, the public had too little information to review, study and comment upon. Now, with thousands of pages of new information to review, the public has no opportunity to point out the potential errors and inadequacies. The public comment period is not supposed to be the same as a `scoping' process wherein concerns and issues are identified and brought to light for detailed analysis; the public comment period is the one opportunity citizens have to review the agency's analyses and provide input to the agency's final decision. The revised FNSI [FONSI] does a much better job of analyzing and explaining the impacts, and probably should have been the version released for comment."[3]
The weight of these comments is significant. CEQ is a statutorily created agency under General Statutes § 22a-11[4], acting within the Department of Environmental Protection (DEP). CEQ is charged, along with the DECD, with commenting on and reviewing evaluations required under sections 22a-1d to 22a-1f, such as the DFONSI and FONSI.
Further, General Statutes § 22a-18 (c) states: "If the agency's CT Page 4409 consideration has not been adequate, and notwithstanding that the agency's decision is supported by competent material and substantial evidence on the whole record, the court shall adjudicate the impact of the defendants' conduct on the public trust in the air, water or other natural resources of the state in accordance with sections 22a-14 to 22a-20, inclusive." Our Supreme Court articulated that "[t]he determination of whether an action may significantly affect the environment is a legal issue, involving the interpretation of § 22a-1b and § 22a-1c, which can be decided by a court." (Internal quotation marks omitted.)Manchester Environmental Coalition v. Stockton, 184 Conn. 51, 68
n. 20, 441 A.2d 68 (1981). This statute, our Supreme Court's directive and this court's finding as to the significance of the studies contained in the FONSI support the conclusion that §22a-1d requires a new comment period and public hearing on the FONSI dated March 9, 2000.
 III
Section 22a-1d (a) requires a comment period and public hearing, if properly petitioned, "on the evaluation or finding that proposed action shall have no significant environmental impact." The parties in this case have different views of the role of the public hearing in the statutory scheme of environmental protection. The plaintiffs seek a new public hearing because they feel they have not had any opportunity to comment on the data presented to the OPM in the FONSI dated March 9, 2000. The defendants view the statutory requirements of a period for public comment and a hearing as a checkpoint to be observed in the CEPA procedure; such a public hearing, once having taken place, serves no further purpose of the agencies, but merely create a further time lag in the orderly completion of the approval process. Mr. Camarata testified in court that he knew of only two public hearings in the long history of CEPA, and in no case had a second hearing ever been held, even though hundreds of applications have been processed.
The court does not view the public comment period and public hearing required in the CEPA process is simply a hurdle to CT Page 4409 overcome. There are reasons to elicit public comment on projects of this magnitude, which will affect the public through the air they breathe, the highways they drive on and how their tax dollars are spent, and those reasons are not inconsequential.
Professor Ernest Gellhorn, in Administrative Law and Process (West Publishing Co. 1972) c. 9, pp. 138-39, points out that the purposes of a public hearing may vary from agency to agency and that broad policy planning should be developed in rulemaking proceedings allowing all interested persons an opportunity to participate.
The project in this case is super-regional in scope and affects not only the five plaintiffs but also countless other persons economically and/or environmentally. These impacts all fall within the scope of the EPA, which has a broad policy of permitting any individual or organization to raise questions in a legal proceeding about any governmental action affecting the environment. It has not been disputed that the plaintiffs have standing to bring this action under § 22a-16. The named plaintiffs, even though two are possible competitors, have standing to bring this action under § 22a-16. There is a significant level of controversy surrounding this project. This mall project is to be supported in significant part by large infusions of public money. The statute requires a public hearing on the written petition of twenty-five persons; no claim has been made that the petition filed in this case is in any way insufficient. A public hearing in the context of a proposed governmental action of this kind has the purpose not only of satisfying the statutory requirement and stimulating the process of providing the agency with sufficient information for decision making, but also giving the public, particularly all of those persons who feel adversely or otherwise affected by the proposed action, an opportunity to ask questions and make comments so that they will not feel "dispossesse[d] . . . `of life, liberty or property' without `due process of law.'" E. Gellhorn, Administrative Law and Process, supra, p. 139. While no constitutional question has been raised in this case, there is undoubtedly great value in permitting the public to feel that their viewpoint has not been ignored or side stepped. CT Page 4410
The cardinal purpose of a public hearing has been clearly enunciated, albeit in the zoning context, by our highest court: "Hearings play an essential role in . . . development. 1 Yokley,Zoning Law Practice (2d Ed.) p. 267. They furnish a method of showing to the commission the real effect of the proposed change upon the social and economic life of the community. Id., p. 268. Hearings likewise provide the necessary forum for those whose properties will be affected by a change to register their approval or disapproval and to state the reasons therefor . . .Couch v. Zoning Commission, 141 Conn. 349, 356-57, 106 A.2d 173
(1954). The Supreme Court further enunciated in Conley v. Boardof Education, 143 Conn. 488, 495, 123 A.2d 747 (1956), that "[t]he only requirement is that the conduct of the [public] hearing shall not violate the fundamentals of natural justice." These views on the nature of a public hearing are applicable to administrative hearings affecting environmental issues because of the public policy set forth in the Environmental Protection Act (EPA).
Moreover, the court is not persuaded by the claim of the defendants that the failure of DECD to adopt regulations originally proposed and similar to those adopted within the National Environmental Protection Act (NEPA), which would have required that an additional public comment period and public hearing be held when the agency supplements its proposed FONSI with additional information, compels the conclusion that no additional hearing is required. The history regarding the adoption of regulations by administrative agencies created by statute does not carry the same weight in the interpretation of the statute as that statutes' legislative history, and no authority has been cited in the support of the defendants' claim.
 IV
In deciding affirmatively that the FONSI is a new and distinct document, as compared to the DFONSI, thus requiring anew the procedure set forth in § 22a-1d, issuing an injunction against agencies charged with the statutory responsibility of evaluation CT Page 4411 and approval must still be carefully considered. Courts are hesitant to interfere with the procedure and decisions of state agencies charged with the responsibility of fact finding and decision making. Nonetheless, this court has the grave responsibility of carrying out the legislative mandate in environmental issues. As the Supreme Court stated in Westport v.State, 204 Conn. 212, 220, 527 A.2d 1177 (1987), "[T]he purpose of the Environmental Policy Act is to ensure systematic consideration of environmental risks at the early stages of planning before the state commits its resources to the particular use of a site." (Emphasis in original.)
Section 22a-16 permits any person to bring an action for "equitable relief" against the state or any political subdivision "for the protection of the public trust in the air, water and other natural resources of the state." Ordinarily, before an injunction may issue, the plaintiffs must prove "irreparable harm and lack of an adequate remedy at law." Tomasso Bros., Inc. v.October Twenty-Four, Inc., 230 Conn. 641, 648, 646 A.2d 133
(1994). In Warner v. City of Norwich, Superior Court, judicial district of Hartford, Docket No. 292615 (May 23, 1984, Aspell,J.) (10 Conn. L. Trib. 42), the court stated where a plaintiff claims violation of a statute, as here, the plaintiff need notprove irreparable harm and lack of an adequate remedy at law. Where the statute invoked specifically provides for injunctive relief, as does § 22a-16, to insure compliance with CEPA, the plaintiff has only to establish a violation of the statute and a balancing of the equities in its favor. See ConservationCommission v. Price, 193 Conn. 414, 429, 479 A.2d 187 (1984). "The rationale underlying [the] rule that the complainant is relieved of his burden of proving irreparable harm and no adequate remedy at law is that the enactment of the statute by implication assumes that no adequate alternative remedy exists and that the injury was irreparable, that is, the legislation was needed or else it would not have been enacted." (Internal quotation marks omitted.) Id., 429. In any event, it has not been seriously disputed that the claimed damage to the five named plaintiffs is irreparable. CT Page 4412
 V
Meaningful arguments, however, were made by all of the defendants in this action as to whether there is an adequate remedy at law available to the plaintiffs, thereby obviating the need for injunctive relief.
The City of New Haven argued in its brief that "where mandamus is available as an appropriate remedy at law to the plaintiffs, the trial court [could] properly deny the plaintiffs' request for an injunction because the plaintiff failed to prove the lack of an adequate remedy at law." This claim is addressed by our Supreme Court in Monroe v. Middlebury Conservation Commission,187 Conn. 476, 481, 447 A.2d 1 (1987), where the court stated that "[i]f the [plaintiff] is entitled to relief, it is not of great importance whether we grant the relief by way of the legal writ of mandamus or the equitable remedy of injunction or by a combination of both." (Internal quotation marks omitted.)
Moreover, the defendants strongly argue that, since OPM has not made its decision, injunctive relief would be premature and illegal. In the Connecticut Environmental Law Handbook, the authors point out that "the OPM reviews the document for completeness, reviews comments, ensures procedural compliance and makes a written evaluation of the document." (Emphasis added.) Wertam Williams, Connecticut Environmental Law Handbook (Government Institute, Inc., 4th Ed. 1996), p. 299.
The sequence of arguments made by counsel and the testimony of agency officials made it clear that the OPM was ready to approve the FONSI.[5] Under these circumstances, the court is, therefore, compelled to intervene because it is clear that the procedure outlined in § 22a-1d has not and will not be complied with. See Smith v. F.W. Woolworth Co., 142 Conn. 88, 111 A.2d 552
(1955). It is concluded that there were no further administrative remedies available. CT Page 4413
 VI
It is well settled that in any injunction action the court "may consider and balance the injury complained of with that which will result from interference by [the] injunction." TomassoBros., Inc. v. October Twenty-Four. Inc, supra, 230 Conn. 648;Moore v. Serafur, 163 Conn. 1, 6, 301 A.2d 238 (1972). The defendants claim that requiring a new comment period and public hearing on the FONSI will have a devastating effect on the city of New Haven. The affidavit of New Haven's mayor, John DeStephano, Jr., claims that New Haven is a distressed community and that the city, in 2000, has already lost $1.8 million in permitting fees from delays in construction of the mall; that if the mall construction is further delayed, the city will lose $3.6 million in permitting fees; and that delay of more than 45 days will severely limit the amount of construction that can be completed in the 2000 construction season and would delay the mall's opening by a year. The court recognizes that these are serious claims.
Although the defendants assert that another notice, comment and hearing period would extend well beyond 45 days, the court finds this argument unpersuasive in light of the fact that testimony by DECD officials indicated that the studies conducted for this project, which are now on file, are exhaustive. Thus, no additional time beyond 45 days for a public comment period and public hearing should be necessary.
Compared with possible economic losses to the city and the developer, there are claims of large economic losses to existing businesses in New Haven and in other regions should the mall be constructed. The serious environmental problems and economic impact revealed by the studies must be considered together with the benefits of evaluation and comment by the public. The possible environmental detriments to the public may, in the long run, be more costly to the city of New Haven, the state and the public than the claimed losses to the city of New Haven by any delay occasioned by following the statutory scheme. See WestportCT Page 4414v. State, supra, 204 Conn. 220. "Once large bureaucracies are committed to a course of action, it is difficult to change that course — even if new, or more thorough, NEPA [CEPA] statements are prepared and the agency is told to `redecide.' It is this type of harm that plaintiffs seek to avoid, and it is the presence of this type of harm that courts have said can merit an injunction in an appropriate case." Massachusetts v. Watt,716 F.2d 946, 953 (1st Cir. 1983).
 VII
In conclusion, this court finds that the FONSI dated March 9, 2000, differs significantly enough from the DFONSI dated February 16, 2000, so as to warrant considering the FONSI a new and distinct document under § 22a-1d and thus subject to the statute's required procedure. While the size and scope of the physical project has not been altered, there is little question that the size and scope of the findings associated with the FONSI of March 9, 2000, and submitted to the OPM changed drastically from the DFONSI of February 16, 1999. A public hearing has not been held on the actual finding of no significant impact, but rather only on the inadequate draft, and it is the final FONSI which the public retains a right to comment. Under the statutory scheme, public meetings are to be convened by the sponsoring agency, in this case, the DECD, and not the OPM. OPM, however, has the responsibility of making sure the statutory process has been observed.
Accordingly, the OPM is permanently enjoined from acting on the FONSI of March 9, 2000, until such time as all requirements of §22a-1d have been satisfied including public notice, a public comment period and a public hearing.
Jerry Wagner Judge Trial Referee